UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

STUDCO BUILDING SYSTEMS U.S., LLC,

                  Plaintiff,                **COMPLAINT**

     v.                          Case No._____

1st ADVANTAGE FEDERAL CREDIT UNION,
JOHN DOE,

                  Defendants.

_____

Plaintiff Studco Building Systems U.S., LLC ("Studco"), by and through its attorneys Beckage PLLC, for its complaint against Defendant 1st Advantage Credit Union ("1st Advantage"), alleges as follows:

## <u>NATURE OF THE ACTION</u>

1. This action concerns 1st Advantage's failure to comport with basic security standards and its knowing aiding and abetting of its member to open a personal checking account to unlawfully divert commercially-coded and clearly identified "business transaction" funds intended for a business beneficiary that 1st Advantage knew was not an account holder, had an address that did not match that of any 1st Advantage account, and was located out of state.

2. In just over one month, 1st Advantage, including by and through the acts of its employee or representative, then assisted the member to make a series of high-volume, high-value withdrawals of over half a million dollars to facially fictitious entities.

3. Once the fraud was discovered, 1st Advantage then acted to conceal the identity of its member, named herein as "John Doe," in an effort to shield itself and its member from liability. As described below, 1st Advantage's actions give rise to actionable claims against it by Studco Building Systems.

## THE PARTIES

4.      Studco is a global manufacturer of premium building systems for commercial and residential construction industries and is organized under the laws of the state of New York and with a primary place of business at 1700 Boulter Industrial Park, Webster, New York 14580.

5.      1st Advantage is a member-owned federal cooperative bank organized under the laws of the state of Virginia with a primary place of business at P.O. Box 2116, Newport News, Virginia 23609.  1st Advantage offers *personal* banking services to its individual members at multiple locations, including servicing of its members while in New York State.

6.       "John Doe" is a member of 1st Advantage whose actions, in concert with those of 1st Advantage and/or its employees, agents or representatives, resulted in the losses described herein.

7.      Additional parties may be named or joined as defendants or indispensable parties to this action once their identities are discovered.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this matter in controversy pursuant to 28 U.S.C. §1332 as the parties are citizens of diverse jurisdictions and the amount in controversy exceeds $75,000.

9.      For purposes of 28 U.S.C. §1332, Plaintiff Studco is a citizen of New York State and Defendant 1st Advantage is a citizen of Virginia.

10.      The Court has personal jurisdiction over the Defendant 1st Advantage pursuant to Fed. R. Civ. P. 4(k)(1), in that 1st Advantage has substantial and continuous contacts in New York State.

11.      1st Advantage's substantial and continuous contacts in New York State include, but are not limited to, its Shared CoOp Network which has over 50 branch locations within this

District, and more throughout New York State.  By its Share CoOp Network, 1st Advantage offers "deposits, withdrawals, loan payments, transfers between accounts," and other services to its members while in New York State.  1st Advantage purposefully directs these, and other, activities to individuals in New York State, and derives benefits from such activities that occur here.

12.     Additionally, 1st Advantage processes transactions originating in, or directed to, New York State, and derives a portion of its revenue from New York State transactions.

13.      Venue is appropriate in this District under 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

**1st Advantage Credit Union Fails to Develop or Implement Required Security Procedures**

14.     1st Advantage is a federally regulated credit union whose individual members have "equal ownership in the credit union, regardless of how much money they have on deposit. One member, one vote."

15.     As a credit union, 1st Advantage serves primarily individuals, and not businesses.

16.     In recent years, 1st Advantage undertook efforts to expand its membership base, and currently reports having over 60,000 individual members.

17.     1st Advantage states that to become a member an individual must meet certain eligibility standards, which it purports to verify, including that the individual reside in certain parts of Virginia or North Carolina, or be related to a pre-existing member.

18.     Membership growth is of critical importance to 1st Advantage's revenue, including by the assessment of fees and interest on new member accounts.

19.     1st Advantage provides its thousands of individual members with personal banking services throughout the country, including in New York State.

20.     In its 2017 Annual Report, 1st Advantage reported having over $630 million in total assets, an all-time high for the credit union and also ranking it among the top third of credit unions nationally by asset size.

21.     According to the 2016 Federal Reserve Survey of Consumer Finances, the median average checking account balance for all United States households is $3,400.

22.     Upon information and belief, the median average personal checking account balance for personal checking accounts held by 1st Advantage members is $3,400 or lower.

23.     As a credit union, 1st Advantage is governed by the National Credit Union Administration, among other regulatory entities and schemes.

24.     As a credit union, 1st Advantage is required to comply with applicable federal and state banking laws including the 2014 "Know Your Customer" ("KYC") regulations of federal Anti-Money Laundering ("AML") laws.

25.     In general, the KYC/AML and other requirements require 1st Advantage to conduct customer due diligence which includes, among other things, verifying a member's identity, address and source of funds.

26.     Additionally, 1st Advantage purports to follow certain security procedures related to its products and offerings to prevent against fraud.  In fact, in the 1st Advantage Agreement & Disclosures, 1st Advantage states that it provides a "commercially reasonable method of providing security against unauthorized payment orders."

27.     In addition to its eligibility requirements, 1st Advantage is also required by law to verify the names, addresses, telephone numbers, business or Tax ID, and information regarding the source of funds, before allowing an individual to open a personal account with 1st Advantage.

28.     1st Advantage is also required by law to monitor all transactions to detect suspicious and fraudulent transactions.

4

29.     Banks and credit unions frequently implement security procedures which use algorithms or other codes, identifying words or numbers, encryption, call back procedures or similar security devices in order to verify the authenticity of, and to detect errors in, member accounts and instructions related to member accounts.

30.     Despite representing to the public on websites, advertising and marketing materials that it utilizes certain security procedures, no reasonable security procedures have actually been developed by 1st Advantage, and no reasonable security procedures are implemented by 1st Advantage related to its members' accounts.

31.     Indeed, in an effort to grow its membership base, 1st Advantage has failed to conduct any due diligence on its members or potential members, as was required by law and industry standard and by 1st Advantage's own public statements.

32.     For the relevant time period and as it relates to the parties here, 1st Advantage did not comply with the KYC/AML and other banking requirements to prevent against the opening of fraudulent accounts, including preventing against illicit monies being sent by or received into 1st Advantage member accounts.

33.     Upon information and belief, for the relevant time period and as it relates to the parties here, 1st Advantage knew it was not in compliance with relevant banking requirements.

34.     Despite being required by law and industry standards to conduct requisite due diligence on its members, 1st Advantage opened an account for an individual, without first verifying that individual's identity, address, or source of funds or eligibility requirements, among other required information.

35.     Despite being required by law to have systems in place to detect and report fraudulent activity, including activities by its own employees or representatives, 1st Advantage assisted its brand new member to open a personal checking account by which to divert $500,000

in obviously stolen commercial or business funds into an individual or personal account, and then substantially assisted this individual by assisting in their withdrawal of those obviously commercial funds through a series of high-value and high-volume cashier checks made out to obviously fictitious entities and individuals.

36.     1st Advantage then protected this individual, its new member, by, among other things, refusing to share information required to assist in the investigation of this individual, including the naming of him or her as a defendant herein, and has otherwise worked to conceal his or her identity from impacted parties.

37.     Upon information and belief, 1st Advantage has concealed this individual's identity and other information regarding the member account because such information provides evidence of 1st Advantage's actions in support of and assistance to its member.

**Motivated by Its Own Self-Interests to Gain Membership and Earn Fees, 1st Advantage Disregards Security Procedures and Allows John Doe to Open a Personal Account**

38.     On or around August 2018, 1st Advantage opened a personal checking account for an individual ("John Doe") at a location in the state of Virginia.

39.     Upon information and belief, John Doe was not previously a member of 1st Advantage, or otherwise known to 1st Advantage.

40.     1st Advantage did not verify John Doe's identity or address, nor did 1st Advantage verify the source of funds intended for the account.

41.     1st Advantage also did not verify whether John Doe was eligible to be a member of 1st Advantage, a credit union that purports to have restrictions and qualification requirements for its members.

42.     Having failed to conduct any due diligence on John Doe, 1st Advantage nonetheless assisted John Doe to become a member of its credit union, and opened a personal

bank account for John Doe, with account routing number XXXX0563 and account number XX4713 (the "Personal Account").

43.     In allowing John Doe to open the Personal Account, 1st Advantage did not verify John Doe's identity, neglecting to review the individual's social security number, date of birth, mailing address, physical address, employment status, prior banking history or source of funds.

44.     Disregarding its purported security protocols and legal requirements, 1st Advantage opened John Doe's Personal Account.

45.     Upon information and belief, 1st Advantage opened John Doe's Personal Account in an effort to expand its membership, gain fees and increase its annual revenue.

46.     Shortly after it allowed John Doe to open the Personal Account, 1st Advantage accepted four high-value commercial ACH credit payments for the Personal Account which totaled over half a million dollars ($500,000).

47.     These ACH payments originated from Studco located in New York State and were directed to an account held by Olympic Steel located in Ohio.

48.     ACH credit payments are electronic transactions governed by the Rules of the National Automated Clearing House Association (NACHA).  Banks that accept ACH transfers, like 1st Advantage, must also comply with NACHA's Operating Rules and Security Framework.

49.     The ACH transfers accepted by 1st Advantage were fraudulent.

50.     1st Advantage knew that the ACH credit payments it accepted from Studco were fraudulent because:

> a.   Each of the commercial ACH wires from Studco were expressly payable to Olympic Steel.
>
> b.   Each of the transfers expressly identified Studco as the payor.
>
> c.   Each of the transfers expressly identified Olympic Steel as the beneficiary.

d.  Each of the ACH transfers expressly identified the transfer as a commercial transaction, and yet were deposited into a personal checking account.

e.  Each of the transfers included a standard entry class code that identified the transfer as a "business transaction."

f.  Each of the transfers included a standard entry class code of "CCD."  Under the NACHA rules by which 1st Advantage is governed, CCD payments are restricted to transactions that involve only businesses.

g.  None of the transfers identified or named John Doe in any way.

h.  None of the transfers were directed to or even included an address in Virginia, the location of the Personal Account.

i.  These ACH payments were roughly 150 times the average checking account balance for 1st Advantage personal account holders.

51.    Specifically, on or around October 3, 2018, 1st Advantage received an ACH transfer of $156,834.55 that on its face identified Studco as the originator and Olympic Steel as the beneficiary or receiver.

52.    1st Advantage knew that Olympic Steel was not a member of the credit union.

53.    1st Advantage knew that the Personal Account was a personal, not commercial account.

54.    1st Advantage nonetheless accepted the commercial transfer intended for Olympic Steel and deposited the $156,834.55 into John Doe's Personal Account.

55.     On or about October 11, 2018, 1st Advantage received an ACH payment of $246,260.44 that named Studco as the originator and Olympic Steel as the beneficiary or receiver.

56.    Again, 1st Advantage knew that Olympic Steel was not a member of the credit union.

57. 1st Advantage knew that the Personal Account was a personal, not commercial account.

58. 1st Advantage nonetheless accepted the commercial transfer intended for Olympic Steel and deposited the $246,260.44 into John Doe's Personal Account.

59. On or around November 2, 2018, 1st Advantage received an ACH payment of $40,980.09 that named Studco as the originator and Olympic Steel as the beneficiary or receiver.

60. Again, 1st Advantage knew that Olympic Steel was not a member.

61. Again, 1st Advantage knew that the Personal Account was a personal, and not commercial, account.

62. 1st Advantage nonetheless accepted this ACH transfer and deposited the $40,980.09 into John Doe's Personal Account.

63. On or around November 9, 2018, 1st Advantage received an ACH payment of $114,793 that named Studco as the originator and Olympic Steel as the beneficiary or receiver.

64. 1st Advantage knew that Olympic Steel was not a member.

65. 1st Advantage knew that the Personal Account was a personal, and not commercial, account.

66. 1st Advantage nonetheless accepted this transfer and deposited the $114,793 into John Doe's Personal Account.

67. The transfers were not error free.

68. The transfers were not duly authorized.

69. The beneficiary's name as identified on the transfers, Olympic Steel, did not match any account holder with 1st Advantage, and 1st Advantage knew this.

70. The beneficiary's address as identified on the transfers, Olympic Steel's corporate headquarters located in Ohio, did not match any account holder with 1st Advantage.

71.     Upon information and belief, 1st Advantage does not have accounts with principal place of business located in the State of Ohio.

72.     For all transfers, 1st Advantage knew the transfers were coded as "business transaction" and that the CCD code did not match the personal checking account of the 1st Advantage Personal Account, or any 1st Advantage account.

73.      The information received by 1st Advantage referred to a nonexistent or unidentified person or account, and 1st Advantage was required to refuse the payment, but did not.

74.     The information received by 1st Advantage conflicted with the account name and address on the Personal Account and 1st Advantage was required to refuse the payment, but did not.

75.      1st Advantage knew that it should have refused the commercial ACH transfers coded "CCD" made payable to Olympic Steel as beneficiary, but it did not do so.

76.      In sum, 1st Advantage and its employees knew that the commercial ACH transfers between two foreign businesses should not have been deposited into the Personal Account of a 1st Advantage member in Virginia, but 1st Advantage deposited those funds into the Personal Account anyway.

77.     At all times, 1st Advantage knew that Studco, a commercial entity based in New York, was the originator of the ACH transfers.

78.     At all times, 1st Advantage knew that Olympic Steel, a commercial entity based in Ohio, was the beneficiary of the ACH transfers.

**1st Advantage Then Aids and Substantially Assists, While Also Benefitting From, the Syphoning of All Monies from the Personal Account**

79.      1st Advantage was required to refuse the ACH transfers as misidentified.

80.     1st Advantage was required to flag the ACH transfers as suspicious and/or fraudulent given their high dollar value commercial nature, which was some 150 times larger than its average personal checking account balances and the average personal checking account balances of accounts in the United States.

81.     Instead, 1st Advantage deposited these clearly marked commercial ACH payments intended for Olympic Steel into John Doe's Personal Account.

82.     Then 1st Advantage substantially assisted John Doe in syphoning virtually every penny out of the Personal Account.

83.     Upon information and belief, in a period of just over one month, 1st Advantage issued over 13 plainly fraudulent cashier checks and wire transfers totaling over half a million dollars ($558,868.71) from the newly opened Personal Account and to clearly fictitious and nonexistent recipients.

84.     Specifically, on or around October 5, 2018, 1st Advantage assisted John Doe and issued a cashier check in the amount of $58,000 from the Personal Account to "Vees Enterprises."

85.     Upon information and belief, and as was known to 1st Advantage, its employee or representative, "Vees Enterprises" is an entity that was newly incorporated by John Doe.

86.     On or around October 17, 2018, 1st Advantage assisted John Doe and issued a cashier check in the amount of $68,000 from the Personal Account to "Vees Enterprises."

87.     Only two days later, on Friday, October 19, 2018, 1st Advantage assisted John Doe and issued a cashier check in the amount of $79,500 from the Personal Account, again to "Vees Enterprises."

88.     The following week, on October 23, 2018, 1st Advantage assisted John Doe and issued a cashier check in the amount of $5,000 from the Personal Account to "Phillip and Gift Abatan."

89.     That same day, October 23, 2018, 1st Advantage assisted John Doe and issued a wire transfer of $50,000 from the Personal Account to "Victoria Jones."

90.     Then, on October 31, 2018, 1st Advantage assisted John Doe by issuing a cashier check in the amount of $25,000 from the Personal Account, again to "Vees Enterprises."

91.     Shortly thereafter, in early November 2018, 1st Advantage assisted John Doe and issued a cashier check in the amount of $38,000, again to "Vees Enterprises."

92.     On or around November 9, 2018, 1st Advantage assisted John Doe and issued a cashier check in the amount of $4,000 from the Personal Account to "KEFHIRNO LATIFAT TEXAS."

93.     In total, over a period of just a few weeks 1st Advantage issued 13 transactions from the Personal Account to various entities for over half a million dollars.

94.     At all times, 1st Advantage, including by its employee and/or representative, knew that John Doe was committing wrongful acts but assisted, and continued to assist, John Doe in those acts.

95.     At all times, 1st Advantage benefited from and obtained fees from John Doe's wrongful acts.

96.     At all times, these funds at issue were the property of Studco.

97.     At all times, Studco had a legitimate interest in the funds.

98.     In assisting John Doe, 1st Advantage also did not use commercial reasonable security procedures.

## 1st Advantage Conceals the Identity of John Doe

99. Upon discovering that 1st Advantage had assisted in the fraudulent conversion of its funds, Studco immediately worked to seek the return of the transfers, including from 1st Advantage and John Doe.

100. In connection with its efforts to recover the funds, Studco has sought information from 1st Advantage, including the true identity John Doe and other information regarding the Personal Account.

101. As recently as the date of filing, Studco has sought this information from 1st Advantage.

102. Studco has offered to enter into a protective order or other confidentiality agreement regarding the identity of this individual and other account information.

103. 1st Advantage is intentionally, and maliciously, withholding the identity of John Doe from Studco and preventing Studco from full relief herein.

104. As a direct result of 1st Advantage's refusal to provide Studco with information concerning John Doe, Studco has been harmed and has been forced to incur fees and costs, including attorneys' fees, which are recoverable against 1st Advantage here.

105. Plaintiff intends to, but cannot, name and effectuate service on John Doe because of 1st Advantage's intentional acts.

106. To date, 1st Advantage continues to refuse to provide this and other relevant information to Studco and continues to conceal John Doe's true identity.

107. Upon information and belief, 1st Advantage's concealment of John Doe's identity and account information stems from its failure to conduct due diligence on this individual, which will be further apparent once the identity is revealed.

108.    Upon information and belief, 1st Advantage's concealment of John Doe's identity and account information stems from a relationship between John Doe and a 1st Advantage employee or representative.

109.    1st Advantage's concealment of John Doe's identity, especially where Studco has offered to enter into protective or confidentiality agreement regarding same, lacks any legitimate basis.

110.    Upon information and belief, 1st Advantage is withholding this information because the information shows or will show 1st Advantage's active role in assisting and abetting the fraudulent activities of its member as described herein.

111.    Among other things, Studco requires discovery to ascertain the true identity of John Doe and further information regarding the Personal Account, which it believes will assist in recovery of funds and assessment of damages in this case.

112.    Studco has been damaged by 1st Advantage's actions as described herein.

113.    Studco and its bank have demanded that 1st Advantage return the ACH payment orders described herein.

114.    Because of 1st Advantage's failure to comply with the Uniform Code of Conduct, plaintiff has been damaged in an amount not less than $558,868.71.

115.    Because of 1st Advantage's failure to comply with federal banking laws, including AML and KYC requirements, plaintiff has been damaged in the amount not less than $558,868.71.

116.    1st Advantage knew the transfers were fraudulent, and was required to refuse those transfers but did not.

117.    Under applicable banking law, 1st Advantage should have filed suspicious activity reports regarding the Personal Account, but upon information and belief it did not.

118.    1ˢᵗ Advantage knew that John Doe's acts were wrongful and assisted substantially in those acts.

119.    1ˢᵗ Advantage knew that John Doe committed fraud but assisted, and continues to assist, John Doe in fraud by concealing his identity and all but ensuring that he escapes prosecution.

120.    Under applicable banking law, 1ˢᵗ Advantage should have filed suspicious activity reports regarding the Personal Account, but upon information and belief it did not.

121.    At all times, 1ˢᵗ Advantage should have used reasonable care and should not have allowed the knowingly fraudulent disbursement of funds from the Personal Account.

### FIRST CAUSE OF ACTION
**(UCC § 4A-207: 1ˢᵗ Advantage, John Doe)**

122.    Plaintiff repeats and realleges all paragraphs above as if set forth fully herein.

123.    John Doe was not entitled to receive payment from Studco.

124.    1ˢᵗ Advantage knew the name and address of John Doe on the Personal Account did not match the name and address of the beneficiary on the ACH payment orders as originated by Studco.

125.    Specifically, the name of the beneficiary on the ACH payment orders was "Olympic Steel" and the address for this beneficiary was "22901 Millcreek Blvd. Suite 650, Highland Hills, Ohio, 44122."

126.    1ˢᵗ Advantage knew that the ACH payment orders referred to a nonexistent or unidentified person who did not hold an account with 1ˢᵗ Advantage.

127.    1ˢᵗ Advantage knew that the ACH payment orders referred to an address that did not match an account with 1ˢᵗ Advantage.

128.    1st Advantage further knew that that the CCD coding and "business transaction" nature of the payment order did not match the nature of the Personal Account.

129.    1st Advantage knew that John Doe did not have rights as a beneficiary of the ACH payment orders.

130.    1st Advantage was required to refuse the ACH payment orders, but did not.

131.    As the originator of the payment orders, Studco has the right to recover those funds from 1st Advantage and John Doe.

132.    As a direct and proximate loss result of the foregoing, plaintiff Studco has been damaged in the amount not less than $558,868.71.

## SECOND CAUSE OF ACTION
### (UCC § 3-420 Conversion of Instrument: 1st Advantage, John Doe)

133.    Plaintiff repeats and realleges all paragraphs above as if set forth fully herein.

134.    The ACH payment orders are instruments under law.

135.    An instrument is unlawfully converted if a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment.

136.    At all times, Studco had an interest in the ACH payment orders.

137.    At all times, Olympic Steel had an interest in the ACH payment orders.

138.    The ACH payment orders lacked proper endorsement.

139.    The ACH payment orders were not properly negotiated.

140.    John Doe was not a proper holder of the ACH payment orders.

141.    John Doe was not entitled to enforce the ACH payment orders.

142.    1st Advantage did not act in good faith or in accordance with reasonable commercial standards.

143.    1ˢᵗ Advantage exercised unauthorized dominion over the ACH payment orders, which it should have refused to accept, but did not.

144.    Studco and its bank have demanded that 1ˢᵗ Advantage and John Doe return the ACH payment orders described herein.

145.    1ˢᵗ Advantage and John Doe have worked together to unlawfully convert the ACH payment orders.

146.    As a direct and proximate loss result of the foregoing, plaintiff Studco has been damaged in the amount not less than $558,868.71.

**THIRD CAUSE OF ACTION**
**(Bailment: 1ˢᵗ Advantage)**

147.    Plaintiff repeats and realleges paragraphs above as if set forth fully herein.

148.    The terms of the ACH payment orders created an implied contract between Studco and 1ˢᵗ Advantage.

149.    1ˢᵗ Advantage accepted the ACH payment orders and benefitted from its acceptances of those orders in the form of fees and other consideration.

150.    By accepting Studco's funds, 1ˢᵗ Advantage agreed to use those funds only as directed by the ACH payment order.

151.    By accepting Olympic Steel's funds, 1ˢᵗ Advantage agreed to use those funds only as directed by the ACH payment order.

152.    By accepting Studco's funds, 1ˢᵗ Advantage owed a duty to Studco as bailee to act with ordinary or reasonable care.

153.    By accepting Studco's funds, 1ˢᵗ Advantage was required not to act in a reckless manner with respect to those funds.

154.    At all times, 1st Advantage was the bailee of the ACH payments, and was required to disburse those payment funds, if at all, in accordance with the payment order instructions.

155.    The ACH payment directly instructed that the payments be deposited in the commercial business account of Olympic Steel, located at a certain address in the state of Ohio.

156.     1st Advantage instead transferred the funds into the Personal Account of John Doe, without authorization and in breach of the payment order terms.

157.    1st Advantage's actions as described herein were grossly negligent as 1st Advantage knew or should have known that the ACH payments were not intended for John Doe or for the Personal Account.

158.    1st Advantage's actions as described herein were grossly negligent as 1st Advantage knew or should have known that the ACH payments were commercial payments between two businesses and not intended for an individual person.

159.    1st Advantage's actions as described herein were grossly negligent as 1st Advantage knew or should have known that the ACH payments were for amounts far in excess of its average personal checking account balance or average deposit.

160.    1st Advantage's action as described herein were grossly negligent as 1st Advantage knew or should have known that its processing of these high-value commercial payments was in violation of banking law and contrary to reasonable security standards.

161.    Within a short period of time, 1st Advantage then quickly set about disbursing over half a million dollars from the Personal Account to obviously fictitious entities, in violation of federal banking law and regulations.

162.    1st Advantage's actions in disbursing over half a million dollars by high dollar value and high-amount cashier checks to fictitious entities over a short period of time were grossly negligent.

163.    The entities were facially fictitious and for newly-formed companies.

164.    The use of high-volume and high-value cashier checks in fraudulent schemes is well known in the banking industry, as was known to 1st Advantage.

165.    1st Advantage's actions in assisting with the withdraw of high-volume and high-value cashier checks from a newly opened personal account by a new member was grossly negligent.

166.    1st Advantage's action in disbursing over half a million dollars without issuing any suspicious activity reports, or notifications, and by failing to require any security verification or to follow any security measures was grossly negligent.

167.    Upon information and belief, 1st Advantage failed to adequately train its employees or representatives and/or failed to have programs in place to detect when its employees or representatives were involved in the facilitation of fraud.

168.    As a direct and proximate result of the foregoing, plaintiff Studco has been damaged in an amount not less than $558,868.71, excluding attorneys' fees, costs and disbursements to which it is entitled.

**<u>FOURTH CAUSE OF ACTION</u>**
**(Fraud: John Doe; Aiding and Abetting Fraud: 1st Advantage)**

169.    Plaintiff repeats and realleges paragraphs above as if set forth fully herein.

170.    John Doe is an individual who committed fraud when he intentionally withdrew funds that he knew did not belong to him from the Personal Account.  As such, John Doe is the primary wrongdoer herein.

171.    1st Advantage knew that John Doe was violating the law when he withdrew funds from the Personal Account.

172.   1st Advantage knew that John Doe was committing wrongful acts, and assisted him in so doing.

173.   First, 1st Advantage knew that the funds in the Personal Account were commercial funds that were intended for Olympic Steel, who did not have an account with 1st Advantage.

174.   1st Advantage knew that Studco had a legal interest in the funds in the Personal Account.

175.   1st Advantage had actual knowledge that the funds in the Personal Account were not intended for John Doe, and did not belong to John Doe.

176.   1st Advantage had actual knowledge that the funds in the Personal Account were intended for Olympic Steel, a commercial business located in Ohio.

177.   The facts show a strong inference that 1st Advantage knew that John Doe intended to, and did, utilize the Personal Account to commit fraud.

178.   By concealing John Doe's identity, 1st Advantage continues to assist John Doe in committing fraud.

179.   Upon information and belief, 1st Advantage continues to conceal John Doe's identity and other information because that information demonstrates that 1st Advantage, its employee or representative, were involved in and/or had direct and actual knowledge of the fraud.

180.   1st Advantage knew or should have known that its actions would harm Studco and others.

181.   1st Advantage knew that the issuance of 13 high-dollar value and high-volume cashier checks and wire transfers out of a Personal Account over a one-month period of time was fraudulent.

182.    By accepting funds that it was required by law to reject, 1st Advantage substantially assisted John Doe in his unlawful acts.

183.    By allowing John Doe to use high-dollar value cashier checks in violation of banking law, 1st Advantage substantially assisted John Doe in his unlawful acts.

184.    By failing to file the requisite suspicious activity reports and make other notifications regarding the Personal Account, 1st Advantage substantially assisted John Doe in his unlawful acts.

185.    By concealing John Doe's identity and information regarding the Personal Account, 1st Advantage has substantially assisted John Doe in his unlawful acts.

186.    By concealing John Doe's identity, 1st Advantage has all provided John Doe with impunity for his unlawful acts.

187.    By concealing John Doe's identity and preventing his prosecution, 1st Advantage has assumed liability for John Doe's acts.

188.    As a direct and proximate loss result of the foregoing, Studco has been damaged in the amount not less than $558,868.71, excluding attorneys' fees, costs and disbursements to which it is entitled.

## FIFTH CAUSE OF ACTION
### (Fraudulent Concealment: 1st Advantage)

189.    Plaintiff repeats and realleges paragraphs above as if set forth fully herein.

190.    John Doe's identity is known to 1st Advantage.

191.    Additional information regarding the Personal Account is known to 1st Advantage, where such information is required for Studco and Olympic Steel to prosecute its claim against John Doe.

192.    1st Advantage has a duty to disclose John Doe's identity to Studco, who has been directly harmed by his malfeasance.

193.    1st Advantage has a duty to provide Studco with information regarding the Personal Account and Studco's funds.

194.     This information is necessary to allow Studco to fully prosecute its claims, obtain full relief, and to allow others to investigate the unlawful activity described herein.

195.    Because of its concealment of this information, Studco has been restrained from acting to fully prosecute its claims.

196.    1st Advantage and its officers know that by concealing this information Studco, and others will be restrained from fully investigating this matter.

197.    Upon information and belief, 1st Advantage is concealing John Doe's identity and other information regarding the Personal Account because such information shows 1st Advantage's failures and liability for the acts of John Doe described herein.

198.    Studco has offered to enter into confidentiality agreement or other protections for the provision of information regarding John Doe and the Personal Account (by which it would only use such information herein), and 1st Advantage continues to conceal and maliciously withhold such information from Studco.

199.    1st Advantage has a duty to disclose this information, even if such information demonstrates 1st Advantage's (or its employee or representative's) own role in the perpetuation of this fraud.

200.    1st Advantage has a duty to disclose this information which concerns the commission of a fraud perpetrated on Plaintiff.

201.    1st Advantage's concealment of this information is against the interests of justice.

202.    As a result of 1st Advantage's concealment of these material facts, plaintiff has been harmed and has suffered actual damages, including by being prevented from fully prosecuting its claims, the risk of loss of relevant evidence, and by being forced to file this lawsuit to preserve its claims, including the incurrence of attorneys' fees and costs related thereto which are recoverable against 1st Advantage.

## SIXTH CAUSE OF ACTION
### (Prima Facie Tort: 1st Advantage)

203.    Plaintiff repeats and realleges paragraphs above as if set forth fully herein.

204.    By concealing John Doe's identity and refusing to share any information with Studco concerning its converted funds, 1st Advantage has caused additional and intentional harm to Studco.

205.    1st Advantage's actions have interfered with Studco's ability to pursue its legal claims and seek reimbursement and relief from John Doe or other parties.

206.    1st Advantage's actions have prevented Studco from ensuring the preservation of crucial evidence in this action, including evidence and information held by 1st Advantage concerning John Doe (such as video surveillance) and/or in the possession of John Doe.

207.    1st Advantage's actions perpetuate the fraud described herein.

208.    There is no excuse or justification for 1st Advantage's actions, where Studco has volunteered to enter into confidentiality agreement and not to use or share the member's identity except in connection with pursuing its legal rights.

209.    There is no excuse or justification for 1st Advantage's actions, where such actions are motivated by 1st Advantage's desire to avoid its own liability here.

210.    There is no excuse or justification for 1st Advantage's actions, where such actions are made so as to interfere with Studco's ability to protect its legal rights and bring legal claims.

211.    1st Advantage's actions have resulted in special damages to Studco, including specifically the incurrence of attorney's fees and administrative costs incurred by Studco's diligent attempts to identify John Doe and obtain relief.

**WHEREFORE,** Studco is entitled to judgment as follows:

A.   Compensatory damages in an amount to be determined at trial but not less than $558,868.71;

B.   Punitive damages in an amount to be determined at trial but not less than $100,000;

C.   Declaratory judgment that 1st Advantage must provide to Studco information concerning John Doe's identity, location and other relevant membership information and Personal Account information;

D.   Interest, costs, attorneys' fees, and disbursements;

E.   Such other and further relief as this Court deems just and proper.

Dated: Buffalo, New York
      November 5, 2019

BECKAGE PLLC

By: */s/ Myriah V. Jaworski*
     Myriah V. Jaworski, Esq.
Jennifer A. Beckage, Esq.
*Attorneys for Plaintiff*
*Studco Building Systems U.S., LLC*
The Liberty Building
420 Main Street, Suite 1110
Buffalo, New York 14202
(716) 898-2102
mjaworski@beckage.com
jbeckage@beckage.com