

FILED

JAN 1 2 2023

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

STUDCO BUILDING SYSTEMS
US, LLC,

                          Plaintiff,

      v.

1st ADVANTAGE FEDERAL CREDIT
UNION,
                           Defendant.

Case No. 2:20-cv-417

### *MEMORANDUM OPINION AND ORDER*

The Court issues this Memorandum Opinion and Order after a bench trial in the above-styled matter to resolve Studco Building Systems US, LLC's ("Plaintiff" or "Studco") claims against 1st Advantage Federal Credit Union ("Defendant" or "1st Advantage"). Plaintiff seeks compensatory damages related to Defendant's processing of a payment order allegedly induced through fraud by beneficiary and asserts claims for violation of the Uniform Commercial Code (UCC), bailment, and fraudulent concealment.[1] Further, Plaintiff seeks punitive and treble damages in an amount not less than $100,000, interest, costs, attorneys' fees, and disbursements.

For the reasons below, the Court **FINDS** in favor of the Plaintiff for Count I and Count III. Accordingly, the Court **FINDS** Defendants liable for compensatory damages in the amount of $558,868.71. The Court enters judgement for Plaintiff.

### I.    PROCEDURAL HISTORY

On November 5, 2019, Plaintiff filed the Complaint in this matter, initiating an action against Defendant for failure to comport with basic security standards that resulted in the unlawful

---

[1] Plaintiff's Motion for Sanctions shall be addressed in a separate Order.

diversion of funds. Complaint ("Compl."), ECF No. 1. Plaintiff filed an Amended Complaint on January 29, 2020. Amend. Compl. ("Am. Compl."), ECF No. 11. The case was then transferred to the Eastern District of Virginia. Case Transfer, ECF No. 23. On December 18, 2020, after full briefing by the parties, the Court dismissed Counts II, IV, VII, and VIII with prejudice as to 1st Advantage and all counts regarding John Doe. Motion to Dismiss Order, ECF No. 41. Defendant answered the Amended Complaint on January 15, 2021. Answer, ECF No. 44.

On May 2, 2020, after full briefing by the parties, the Court denied the parties' cross-motions for summary judgment. Summary Judgment Order ("Summ. J. Or."), ECF No. 103. On May 26, 2022, both parties filed a Joint Statement of Uncontested Facts. Joint Pretrial Stip. ("J. Pretrial Stip."), ECF No. 111. The Court held a bench trial, which commenced on September 13, 2022. The parties filed post-trial briefs, and this matter is now ripe for judicial determination. Defendant's Proposed Findings of Fact, ("Def.'s Prop. Facts") ECF No. 117; Plaintiff's Proposed Findings of Fact, ("Pl.'s Prop. Facts") ECF No. 118. The Court issues the following Findings of Fact and Conclusions of Law, as required by Rule 52(a) of the Federal Rules of Civil Procedure.

## II.     FINDINGS OF FACT

### A.     Stipulated Facts

The parties have stipulated to the following facts, which the Court accepts and finds:

1.     Lesa Taylor opened an account at 1st Advantage in 2010 (the "2010 Account") which remained open through 2018. J. Pretrial Stip., ECF No. 111.

2.     Lesa Taylor opened an account at 1st Advantage in 2015 (the "2015 Account") which remained open through 2018. *Id.*

3.     On August 9, 2018, Lesa Taylor opened a personal account (Account No. xxx713) at 1st Advantage (the "Account"). *Id.*

4.      On October 1, 2018, Studco received a "spoofed" email from an unknown third party purporting to be from Olympic Steel, and fraudulently instructing Studco to change its banking remittance information to the Account. *Id.*

5.      In 2018, Keith Ward was 1st Advantage's Compliance Manager. *Id.*

6.      In 2018, Keith Ward was the highest-ranking employee in 1st Advantage's compliance department. *Id.* at 2.

7.      From October 4 to November 13, 2018, Studco made four ACH deposits identifying Olympic Steel as the beneficiary but listing Lesa Taylor's 1st Advantage account number. *Id.*

8.      The ACH deposits originating from Studco's account with JP Morgan Chase totaled $558,868.71, broken down as follows:

   a.   On October 4, 2018 for $156,834.55.

   b.   On October 16, 2018 for $246,260.44;

   c.   On November 5, 2018 for $40,980.09; and

   d.   On November 13, 2018 for $114,793.63. (collectively referred to as the "ACH deposits"). *Id.*

9.   The following, Table 1, is an accurate representation of (a) starting and ending balances for the Account, and (b) withdrawals and deposits for the Account, between August 9, 2018 and December 31, 2018:

| Date | Amount | Event |
|---|---|---|
| August 9, 2018 | $100.00 | Starting Balance |
| August 30, 2018 | $100.00 | Ending Balance |
| | | |
| September 1, 2018 | $100.00 | Starting Balance |
| September 30, 2018 | $11.88 | Ending Balance |
| | | |
| October 1, 2018 | $11.88 | Starting Balance |
| October 4, 2018 | $156,834.55 | ACH from "STUDCO BUILDING" |
| October 5, 2018 | $58,000.00 | Cashier's Check Withdrawal |
| October 10, 2018 | $46,000.00 | Outgoing Domestic Wire |
| October 12, 2018 | $45,000.00 | Outgoing Domestic Wire |
| October 16, 2018 | $246,260.44 | ACH from "STUDCO BUILDING" |
| October 17, 2018 | $68,000.00 | Cashier's Check Withdrawal |
| October 19, 2018 | $79,500.00 | Cashier's Check Withdrawal |
| October 23, 2018 | $50,000.00 | Withdrawal |
| October 25, 2018 | $10,464.14 | International Wire Transfer Attempted |
| October 25, 2018 | $26,535.86 | International Wire Transfer Attempted |
| October 30, 2018 | $10,464.14 | International Wire Transfer REVERSED |
| October 30, 2018 | $26,535.86 | International Wire Transfer REVERSED |
| October 31, 2018 | $25,000.00 | Withdrawal |
| October 31, 2018 | $10,000.00 | Withdrawal |
| October 31, 2018 | $1,282.90 | Ending Balance |
| | | |
| November 1, 2018 | $1,282.90 | Ending Balance |
| November 5, 2018 | $40,980.09 | ACH from "STUDCO BUILDING" |
| November 6, 2018 | $38,000.00 | Cashier's Check Withdrawal |
| November 13, 2018 | $114,793.63 | ACH from "STUDCO BUILDING" |
| November 14, 2018 | $60,000.00 | Outgoing Domestic Wire |
| November 16, 2018 | $45,000.00 | Outgoing Domestic Wire |
| November 31, 2018 | $11.12 | Ending Balance |
| | | |
| December 1, 2018 | $11.12 | Ending Balance |
| December 31, 2018 | $0.00 | Ending Balance |

10.   All cashier's check withdrawals represented in Table 1 occurred at a physical 1st Advantage bank branch. *Id.* at 3.

11.   All attempted or actual wire transfers represented in Table 1 occurred at a physical 1st Advantage bank branch. *Id.*

12.   Between October 4, 2018 and November 16, 2018, 1st Advantage used anti-money laundering software called Financial Crimes Risk Manager ("FCRM") that monitored its members' transactions. *Id.*

4

13.    FCRM was a "rules-based system" developed by FiServ, a public company that develops financial transaction security products used by thousands of financial institutions. Fiserv pre-programed rules into FCRM that triggered an "alert" when transactions occurred in a member's account that violated one of these rules. *Id.*

14.    1st Advantage's compliance analysts reviewed alerts generated by FCRM on a daily basis. *Id.*

15.    Lesa Taylor attempted to make two international wires at a 1st Advantage branch on October 25, 2018. Related to the attempted international wire transfers:

    a.   The attempted wire transfers created an alert by the Office of Foreign Asset Control ("OFAC"), which is different from a FCRM alert;

    b.   The alert was based on the destination of the proposed outgoing wire transfer;

    c.   1st Advantage discussed the transfers with Ms. Taylor and, due to Ms. Taylor possessing insufficient information about the identity of the recipients, 1st Advantage declined to make the proposed international wire transfers;

    d.   Other than declining to make the two proposed international wire transfers, 1st Advantage did not restrict or otherwise stop activity into or out of the Account between October 25, 2018, and November 21, 2018. *Id.* at 3-4.

16.   It is the policy of 1st Advantage to conduct its ACH activities in compliance with all applicable Rules of the National Automated Clearing House Association ("NACHA"). *Id.* at 4.

17. 1st Advantage received an investigative subpoena regarding the ACH transactions at issue in this case, from the Federal Bureau of Investigation ("FBI") in or about the beginning of February 2019. *Id.*

**B.   Additional Factual Findings**

The Court makes the following additional factual findings:

### *Company Background*

1.   Studco is a manufacturer of commercial metal building products for the wall and ceiling industry.  Trial Transcript ("Tr") at 5:11-14.

2.   Studco purchases raw materials from suppliers to manufacture metal building products. Tr. 5:18-21.

3.   One of those suppliers is Olympic Steel, Inc. ("Olympic Steel"). Tr. 5:22-23.

4.   Studco purchases raw steel coil from Olympic Steel. Tr. 5:11-6:1.

5.   Studco had been buying from Olympic Steel for nine years. Tr. 6:2-4.

6.   Defendant, 1st Advantage Federal Credit Union ("1st Advantage"), is a federally chartered, not-for-profit, member-owned credit union. Tr. 265:2-18.

7.   1st Advantage is a "community-based" credit union; its federal charter and federal law limit 1st Advantage membership to residents of Hampton Roads area up to Richmond and a portion of North Carolina. Tr. 265:18-266:2.

### *The 2018 Email and Account Change*

8.   Studco has a standard process to pay for orders with vendors like Olympic Steel. Tr. 6:16-10:11.

9.   Studco's payment of vendor invoices typically goes through three levels of approval. Tr. 9:7- 10.

10. The purchasing process begins when Studco has a conversation by phone with suppliers that is then confirmed by email. Tr. 6:16-20. After the conversation and email a purchase order is sent to the vendor. *Id.*

11. After Studco receives the invoice, the accounts payable clerk matches the invoice with the purchase order. Tr. 8:12-18.

12. After that occurs, the purchasing manager that initially placed the order revises the invoice. Tr. 8:18-21.

13. The payment is then entered in Studco's computer system by accounts payable and sent to Studco's Global Managing Director, Ben Stevens, for final approval. Tr. 8:22-9:1.

14. Studco has a documented policy in place for changing a vendor's payment information. Tr. 10:16-11:6; Pl.'s Exhs. 17, 18.

15. Under the policy, the finance person responsible for accounts payable has the authority to change the vendor's banking details in Studco's payment system. Tr. 12:20-13:2; Pl.'s Exhs. 17, 18.

16. In 2018, Studco utilized a vendor – LMT Technology Solutions, Inc. ("LMT") – to maintain and monitor its information technology (IT) infrastructure. Tr. 14:6-12.

17. LMT performed system updates, managed firewalls, conducted network testing, and conducted employee training on phishing and spoofing attacks. Tr: 14:6-22. LMT also made recommendations on changes to Studco's internal policies to improve its security. Tr. 14:23-15:2

18. Until September 2018, Studco was never the victim of a security incident. Tr. 15:10-18.

19. Studco became the victim of unknown third-parties gaining access to its email system in September 2018. Tr.16:13-18.

20. Studco learned of the email intrusion on November 20, 2018. Tr. 16:13-18.

21. Upon learning of the intrusion, Studco immediately contacted relevant parties, including its IT provider (LMT), its bank, its lawyers, and its insurance brokers. Tr. 16:25-17:9.

22. LMT began investigating Studco's email system to determine how the third-parties accessed Studco's system, determine the extent of the third-parties' activities in Studco's email system, and remove the third-parties' access Studco's emails. Tr. 17:7-17.

23. In the course of LMT's investigation, it learned that unknown third-parties gained access to Studco's email system on September 24, 2018. Tr. 34:21-25. Between September 2018 and November 2018, these third-parties monitored Studco's communications, including communications between Studco and its vendor Olympic Steel. Tr. 18:3-19.

24. The legitimate email from Olympic Steel instructing Studco to change the company's banking information. Pl.'s Exh. 16.

25. No one at Studco received the legitimate email from Olympic Steel. Tr. 54:9-55:12.

26. The third parties sent Studco a "spoofed" email on October 4, 2018. Tr. 35:12-36:19. Pl.'s Exh. 16.

27. The spoofed email, purportedly from Olympic Steel notified Studco to direct future vendor payments to an account at 1st Advantage. Tr. 19:3-18. Pl.'s Exh. 12 at 2.

28. Before receiving the spoofed email, Olympic Steel had previously informed Studco it would be sending Studco a change in banking instructions. Tr. 19:19-20:7.

29. Following the instructions in the spoofed email, Studco updated its vendor payment information for Olympic Steel to the 1st Advantage account. Thereafter, Studco's payments for invoices submitted by Olympic Steel were directed to that account. Tr. 19:8-11.

### 1st Advantage's Risk Management Systems

30. The Bank Secrecy Act ("BSA") requires U.S. financial institutions to assist U.S. government agencies to detect and prevent money laundering, which includes reporting suspicious activity that might signify money laundering, tax evasion, or other criminal activities. Tr. 217:12-18; Tr. 224:12-225:7.

31. The automated clearinghouse (ACH) system is a nationwide network through which depository institutions send each other batches of electronic credit and debit transfers. The National Automated Clearinghouse Association ("NACHA") Operating Rules direct how the ACH Network is operated. Tr. 198:9-12.

32. It is the policy of 1st Advantage to conduct its ACH activities in compliance with the NACHA Operating Rules, Federal Reserve regulations, and Article 4A of the Uniform Commercial Code. Tr. 155:22-25; Tr. 158:17-159:13 Pl's Exh. 3 at 1.

33. To comply with BSA requirements, 1st Advantage relied on anti-money laundering software called "FCRM." Tr. 79:5-10.

34. FCRM is a "rules-based" software that monitored transactions in 1st Advantage's customers' accounts for suspicious activity based on pre-programmed rules in the software. Tr. 79:5-80:2.

35.  When a transaction triggers a rule, the software creates an "alert." Tr. 79:20-25.

36.  As of 2018, FRCM was one of the mostly commonly used AML software programs by credit unions in the country. Tr. 85:23-86:4.

37.  FCRM was pre-programmed with rules that would trigger an alert if a transaction "broke" a rule. Tr. 84:14-17.

38.  The conditions in the rules were designed around common factors indicating suspicious or criminal activity in the account. Tr. 85:22-24.

39.  1st Advantage did not change the pre-programmed rules in FCRM. Tr. 85:13-19. Rather, 1st Advantage was using the "out-of-the-box" rules in FRCM. Tr. 85:20-22.

40.  Depending on the type of FCRM alert triggered, 1st Advantage's analysts would investigate the alerts to determine appropriate next steps. Tr. 80:4-13.

41.  In investigating the alert, the analysts could review past account activity, general account activity, and the accountholder's relationship with the institution. Tr. 80:11-22.

42.  Historical account activity is a significant factor in determining what next steps should be taken. Tr. 81:1-4.

43.  The possible next actions for an alert included: (a) further monitoring, (b) opening a case to look deeper in the activity that generated the alert, (c) placing a restriction on the account, (d) closing the account, or (e) doing nothing. Tr. 81:5-82:1.

44.  1st Advantage had no documented guidelines to determine the appropriate next action based on an alert. Tr. 82:2-19. Rather, when investigating an account, 1st Advantage made decisions on a case-by-case basis. Tr. 82:9-19

45.  Once posted to an account, each ACH transaction generates a report within 1st Advantage's core computer system. These reports, known as "DataSafe reports," are automatically generated and stored within 1st Advantage's electronic filing system, Optical, without any human involvement. Tr. 184:4–15.

46.  These DataSafe reports contain "warnings" if the identified payee on the payment order does not exactly match the name of the receiving account holder. Tr. 179:13–25

47.  1st Advantage's system generates "hundreds to thousands" of warnings related to mismatched names on a daily basis. Tr. 177:15–25.

48.  The majority of warnings generated on a daily basis are not useful to 1st Advantage, nor does the system notify anyone at 1st Advantage when a warning is generated. Tr. 179:2–4; Tr. 180:1–2.

49.  For at least 26 years, it has never been the regular course of conduct for anyone at 1st Advantage to review DataSafe warnings. Tr. 180:10–13.

50.  Veronica Deans ("Deans") is the highest-ranking person in 1st Advantage's ACH department. Tr. 157:8-10.

51.  Deans was the primary person responsible to ensure 1st Advantage was processing ACH payments within the NACHA Rules and other applicable guidelines. Tr. 156:4-8.

52.  Deans was responsible for any questions related to fraudulent ACH payments. Tr. 157:8-11.

53.    In 2018, 1st Advantage had a written policy related to processing ACH payments. However, that policy did not address how to handle misdirected payments or fraudulent ACHs. Tr. 158:1-160:2; Pl's Exh. 3.

54.    1st Advantage also did not have a system in place to monitor for fraudulent incoming ACH payments. Tr. 162:13-16.

55.    1st Advantage's ACH system will create an "exception" if something is "wrong with the transaction" and therefore requires manual intervention before 1st Advantage can post an incoming ACH to an account. Tr. 160:6-12.

56.    1st Advantage's ACH system also generated "Warning" reports. Tr. 160:16-18.

57.    1st Advantage's system would generate a Warning if the intended beneficiary of an incoming ACH did not match the name of the customer receiving the ACH. Tr. 162:17-22.

58.    Each of the four incoming ACHs from Studco generated a Warning but did not generate Exceptions. Tr. 172:1-8; 173:16-23; 175:3-9; 176:10-17; Pl.'s Ex 2.

59.    1 st Advantage's ACH policy did not address how 1st Advantage should handle "exceptions" or Warnings. Tr. 160:13-21.

60.    The Warnings were generated in real time to 1st Advantage received an ACH containing a misdescription. Tr. 162:23-163:4.

61.    The Warnings are saved in 1st Advantage's Optical system. Tr. 163:5-6.

62.    1st Advantage does not review the Warnings. Tr. 163:7-8;

63.    The ACH department has the ability to review the documents Optical. Tr. 163:6-12.

64. Deans testified that she did not know why 1st Advantage has a system that generates Warnings only for them to be ignored. Tr. 163:16-21.

65. Deans testified that the ACH system generates "hundreds to thousands" of Warnings per day. Tr. 177:15-25.

66. Deans acknowledged that the ACH system creates multiple types of Warnings and no one at 1st Advantage reviews the Warnings. Tr. 179:5- 12; 188:2-189:3.

67. Each of the four incoming ACHs from Studco had a "CCD" classification which indicates a corporate payment that is typically for business-to-business transactions. Tr. 169:15-170:1; Pl.'s Exh. 2.

68. Since each of the four ACH transfers from Studco to the Account at 1st Advantage did not generate an exception the system automatically deposited the incoming funds without human involvement. Tr. 183:3-13.

### The Account at 1st Advantage

69. On or around August 9, 2018, Lesa Taylor ("Taylor") visited a 1st Advantage branch to open an account (the "Account"). Tr. 64:22-24.

70. Taylor had an eight-year relationship with 1st Advantage with no history of fraud. Tr. 267:17-25.

71. Taylor was sole owner of the Account as well as a joint owner on an account opened April 12, 2010 (the "2010 Account") and on an account belonging to her grandson (the "2015 Account"). Pl.'s Exh. 4.

72. At the time Taylor opened the account, she informed 1st Advantage that the account would be used for real estate transactions. Tr. 66:15-67:5.

73.    Taylor's application to open the account stated her occupation as "merchant coordinator." Tr. 67:6-24; Pl.'s Exh. 19 at 1.

74.    The account opening triggered an "ID verification warning" which was resolved by retail staff. Tr. 69:19-23; Pl.'s Exh. 7.

75.    The system identified a few discrepancies in the information provided to the information on file. Tr. 69:14-18.

76.    The alert stated that the system was not able to verify the address that was provided by Taylor. Tr. 73:7-22.

77.    The alert was sent to Kelley Whiting, a compliance specialist in the Compliance department. Tr. 70:15-18; Pl.'s Exh. 7.

78.    Keith Ward ("Ward"), who was 1st Advantage's Compliance Manager was cc'd on emails regarding how the retail team verified the address for Taylor's account. Tr. 71:2-72:11; Pl.'s Exh. 7.

79.    The retail staff qualified the information based on Taylor's existing relationship with 1st Advantage. Tr. 69:19-23.

80.    Despite the discrepancies and alert, 1st Advantage allowed Taylor to open the Account. Tr. 74:9-12.

81.    The Account was a personal checking account, and not a business or commercial account. Tr. 68:16-18.

82.    Taylor's 2010 Account had been active for approximately eight years as of the date Taylor opened her new Account in 2018. Tr. 77:23-78:1.

83.    In those eight years, the 2010 Account never had a balance or withdrawal over $10,000 and never had a deposit of six figures. Tr. 78:2-10.

14

84. Taylor's 2015 Account had been active for approximately three years as of the date Taylor opened her new Account in 2018. Tr. 78:11-14.

85. In those three years, the 2015 Account never had a balance or withdrawal over $10,000 and never had a deposit of six figures. Tr. 78:11-20.

86. Ward testified that the historical account activity in Taylor's 2010 Account and 2015 Account was "significantly different" than the five- and six-figure deposit and withdrawal activity in Taylor's new Account in October and November 2018. Tr. 78:25-79:4.

87. Each of the ACH Deposits to the Account:

    a.   Listed "Olympic Steel Inc." as the intended beneficiary Tr. 76:25-3;

    b.   Listed the Account number as the recipient Tr. 76:25-3;

    c.   Had a "CCD" code indicating it was a commercial or business-to-business transfer; and

    d.   Generated a "WARNING" in 1st Advantage's systems notifying 1st Advantage of the discrepancy between the account holder name and name of the intended beneficiary. Tr. 168:7-176:17.

88. Neither Studco nor Olympic Steel were customers of 1st Advantage. Tr. 266:9-18.

89. Taylor made each of the withdrawals from the Account through an in-person transaction at a 1st Advantage branch. Tr. 131:5-11.

90. A "very small percentage" of 1st Advantage's customers have transactions similar in size to the transactions occurring in the Account. Tr. 153:14-18.

91. 1st Advantage's tellers received training on detecting suspicious activity by customers. Tr. 131:12-14.

92.    1st Advantage's tellers are trained to "notify the proper individuals" if they "notice something" in the "normal processing" of a transaction. However, tellers are not trained to "do a deep dive into an account." Tr. 131:19-25.

93.    1st Advantage tellers are also trained to look at account history or bring in a manager when there is suspicious activity. Tr. 132:17-133:6.

### *Alerts on the Account*

94.    On October 25, 2018, Taylor visited a 1st Advantage branch and attempted two international wire transfers totaling $37,000.00. Tr. 113:15-24

95.    The attempted wire transfers triggered an Office of Foreign Assets Control ("OFAC") alert in 1st Advantage's fraud detection systems. Tr. 113:25-114:4.

96.    The OFAC alert caused Taylor's account to be escalated to the compliance department. Tr. 114:10-115:11.

97.    The OFAC alert caused 1st Advantage to question the purpose of Taylor's attempted international wires. Tr. 115:12-25.

98.    Due to the OFAC alert and the suspicious nature of the two wire transfers, 1st Advantage cancelled the two wire transfers. Tr. 114:5-115:25; Pl.'s Exh. 8.

99.    Following the cancellation of Taylor's October 25, 2018 attempted wire transfers, 1st Advantage suspended "[a]ll wire[] transactions . . . pending further review." Tr. 117:2-8; Pl.'s Exh. 8 at 2.

100.   Taylor's attempted wire transactions caused Ward and the Compliance Department to start an "ongoing investigation." Tr. 120:9-20

101.   As a part of that "ongoing investigation," the Compliance Department looked at Taylor's account "a handful of times" between October 25, 2018 and November 21, 2018. Tr. 121:3-5; 123:3-25; 277:17:278:7.

102.   Ward testified that "historical transactions" are one of the biggest factors in determining whether there is suspicious activity in an account. Tr. 124:11-19.

103.   At all relevant times, Ward and the Compliance Department had access to "Optical," which was 1st Advantage's storage system for all of Taylor's account statements and member documents. Tr. 125:12-25.

104.   Ward testified inconsistently regarding whether the Compliance department looked at all transactions in the Account. Tr. 119:9-120:5.

105.   Ward testified that he did personally review Taylor's attempted wire activity on October 25, 2018, but he did not look at any of the other transactions in the Account. Tr. 152:3- 18.

106.   Ward testified at trial that the "primary focus at the time" was the attempted wires only. Tr. 152:9-14.

107.   During the handful of times that Ward looked into Taylor's account between October 25, 2018 and November 21, 2018, he looked at the account history in Taylor's account. However, Ward could not articulate the exact dates he reviewed that account history. Tr. 124:1- 10; 278:4-16.

108.   Ward did not create any documentation of his ongoing investigation of Taylor's account. Tr. 124:20-125:6; 129:7-11.

109.   Ward agreed that when 1st Advantage was performing an investigation it was "best practice to get as much documentation as possible." Tr. 125:7-11.

110.   At Ward's direction, 1 st Advantage reversed the two fraudulent wires on October 30, 2018. Tr. 126:4-127:3.

111.   Despite its ongoing investigation and a restriction on the account to suspend further wire activity on the Account, 1st Advantage allowed outgoing wire transfers on November 14 and November 16. Tr. 129:12-130:1.

112.   Despite 1st Advantage testifying that FCRM was designed to and should have triggered alerts for numerous transactions in the Account, Ward testified that FCRM "to his knowledge" did not trigger an alert. Tr. 109:21- 110:14; 145:13-15.

113.   Ward could not explain why FCRM did not trigger any alerts for Taylor's activity. Tr. 139:17-20.

114.   Based on 1st Advantage's description of the rules, the transactions in Table 1 would have triggered multiple alerts in FCRM.

115.   1st Advantage agreed that:

   a.   Taylor's Account was a "new account" and that the six-figure balances in the new account should have triggered the new account alert. Tr. 97:5-8.

   b.   The first ACH deposit from Studco on October 4, 2018, the second ACH deposit from Studco on October 16, 2018, the third ACH deposit from Studco on November 5, 2018, and the fourth ACH deposit from Studco on November 13, 2018 should have all triggered FCRM alerts, including "high product service" and "new accounts" alerts. Tr. 108:11-25; Tr. 103:1-9. Tr. 104:14-105:11. Tr. 105:23-106:12; 108:5-10.

   c.    Taylor's withdrawals on October 5, 2018, October 10, 2018 and October 12, 2018, Taylor's withdrawals on October 17, 2018, October 19, 2018 and October

18

23, 2018, and Taylor's withdrawals on November 6, 2018, which all substantially removed the entirety of the preceding ACH deposits within days of the previous deposit, should have triggered FCRM alerts, including the "pass through account" rule. Tr. 103:11-104:13. Tr. 105:12-106:12. Tr. 107:13-108:10 Tr. 107:13-108:10.

d. Taylor's subsequent withdrawals, which substantially removed the entire November 13, 2018 ACH within three days of deposit, should have triggered FCRM alerts. Tr. 109:1-20.

### *Expert Testimony*

116. Studco's Expert Witness, Elliott McEntee ("McEntee"), was qualified as a witness in the fields of risk management and ACH transactions at financial institutions without objection from 1st Advantage. Tr. 201:18-202:19.

117. Of relevance, McEntee has over 30 years of experience in risk management and ACH transactions at financial institutions. He was involved in creating the modern ACH system, and was involved in writing the NACHA rules as the former president of NACHA. Tr. 195:9- 196:17; 198:7-19

118. McEntee explained that based on the discrepancies at the Account opening, 1st Advantage should not have allowed the Account to be opened or should have flagged the account as a potentially risky account. Tr. 207:11-18.

119. McEntee explained that it was not commercially reasonable to allowed the ACH deposits in Taylor's Account. Tr. 208:20-209:16.

120.  The ACH Warnings "spelled out very clearly why [each of the incoming ACHs] were suspicious" and 1st Advantage "should have taken action, and . . . put a hold on the account." Tr. 209:6-12. 133.

121.  McEntee testified that 1st Advantage's custom of not viewing Warnings because there are too many of them was not commercially reasonable because 1st Advantage could have sorted for medium and high value transactions. Tr. 211:3-19.

122.  McEntee explained that the ACH rules allow financial institutions receiving ACH deposits to post a payment with a CCD classification in a personal account but, it is not without risk. Tr. 213:18-214:5. 135.

123.  McEntee explained that NACHA Rule 3.8.4 "requires a financial institution to return the transaction that they're not able to post because there's something wrong with the receiver's account." Tr. 216:25-217:3.

124.  Thus, 1st Advantage should have returned the ACHs from Studco because Olympic Steel did not have an account at 1st Advantage. Tr. 217:4-9; 218:1-3. Pl.'s Exh. 27

125.  McEntee explained that it was not commercially reasonable for 1st Advantage to have allowed Taylor to withdraw the funds fraudulently posted to her account. Tr. 221:10-18.

126.  In 2018, there was tremendous publicity around individuals opening an account for the purpose of assisting in laundering money and moving it overseas. Tr. 221:21-222:5.

127. The types of withdrawals used by Taylor – cashiers checks and wire transfers – were the type that should "create bells and whistles, alarms and red flags" because they are the "two main methods" used in money laundering. Tr. 222:6-23

128. McEntee opined that 1st Advantage would have been justified in restricting the account after the very first ACH deposit on October 4, 2018. Tr. 229:24-230:24.

129. McEntee explained that it was not commercially reasonable for 1st Advantage to not take an active role in determining the thresholds for the alerts in the rules. Tr. 235:1-9.

130. McEntee testified that it was not commercially reasonable for 1st Advantage to allow commercial deposits into a personal account. Tr. 262:3-13.

131. McEntee opined that it was not commercially reasonable for 1st Advantage to fail to review the historical account activity in addition to its automated processes. In particular, Ward should have looked past the attempted international wires on October 25, 2018. Tr. 262:14-263:8.

132. McEntee explained that it was unreasonable for 1st Advantage allow the deposits into the personal account, which was a new account that had a very small starting balance, and multiple large-value transactions. Tr. 262: 3-13.

133. McEntee testified that the Account should have been flagged as a new account, because the guidelines of 1st Advantage stated that a new account should be monitored in the first 180 days because if there is a problem with the account it generally happens in the first few months. Tr. 207:15-208:3.

*1st Advantage's Discussions with Studco and November 2018 Investigation*

134. The President of Studco, Ben Stevens, called the general telephone number of 1st Advantage, eventually speaking to Ward, on November 21, 2018. Tr. 21:9-15.

135. When Ward spoke to Stevens, he provided information that allowed 1st Advantage to identify "the accountholder within 1st Advantage." Pl.'s Exh. 4 at 1.

136. 1 st Advantage froze all of Taylor's accounts. Tr. 268:21-25.

137. Ward spoke with Taylor about the ACH transfers on November 23, 2018; she told him that she had applied to work as a secretary with a person doing real estate transactions and was conducting those transactions based on a job for applied for. Tr. 271:17–272:3.

138. 1st Advantage shared information about the Account and the activity with JPMorgan Chase as well as SunTrust. Tr. at 270:24–271:6.

139. SunTrust and JPMorgan Chase initiated an investigation. Pl.'s Exh. 4.

### III. CONCLUSIONS OF LAW

The Court has made the following conclusions of law:

1. Diversity jurisdiction in this action is conferred upon the Court by 28 U.S.C. §1332. Studco is a corporation organized under the laws of the state of New York and with a primary place of business in New York. 1st Advantage is a member-owned federal cooperative bank organized under the laws of the Commonwealth of Virginia with a primary place of business in Virginia. The amount in controversy exceeds $75,000 because Studco is seeking $558,868.71 in compensatory damages.

2. This case was properly transferred to this Court by the United States District Court for the Western District of New York.

3.   Venue is proper under 28 U.S.C. § 1391 in any judicial district in which the defendant is properly subject to personal jurisdiction. 28 U.S.C. § 1391(b) and (c). Venue is proper pursuant to § 1391 because a substantial part of the acts giving rise to the claims occurred in this District and Defendant is domiciled in this District.

**Count I: Misdescription of Beneficiary Under UCC § 4A-207**

4.   Under the Virginia Commercial Code ("VCC"), Studco has the right to recover the fraudulent ACH deposits that 1 st Advantage received if Studco shows that 1 st Advantage "[knew] that the name and [account] number" of the incoming ACHs from Studco "identif[ied] different persons.".

5.   The VCC provides that if a bank receives a payment order that identifies the beneficiary by name and account number, a bank may rely on the account number even if the number and name identify different persons. Va. Code Ann. § 8.4A-207. This is not true if a bank knows the number and name refer to different persons. *Id.* For purposes of this statute, "Know" means actual knowledge. Va. Comm. Ann. § 8.1A-202.[2]; *see also, AG4 Holding, LLC v. Regency Title & Escrow Servs., Inc.,* 98 Va. Cir. 89 (2018).

6.   Actual knowledge of information received by the organization is effective for a particular transaction from the time it is brought to the attention of the individual conducting that transaction and, in any event, from the time it would have been brought to the individual's attention if the organization had exercised due diligence. Va. Comm. Ann. § 8.1A-202(f). An organization exercises due diligence if it

---

[2] Code § 8.1–201 was repealed effective July 1, 2003 and was replaced by Code § 8.1A–202. Subsection (b) of the new version states: " 'Knowledge' means actual knowledge. 'Knows' has a corresponding meaning."

maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routines. *Id.*

7.    The drafters of the statute recognized that a "very large percentage of payment orders issued to the beneficiary's bank by another bank are processed by automated means using machines capable of reading orders on standard formats that identify the beneficiary by an identifying number or the number of a bank account. The processing of the order by the beneficiary's bank and the crediting of the beneficiary's account are done by use of the identifying or bank account number without human reading of the payment order itself. The process is comparable to that used in automated payment of checks." Va. Code Ann. § 8.4A-207, Official Comment 2.

8.    To put it another way, a bank may accept a wire transfer relying solely on the number as the proper identification of the beneficiary of the order and it has no duty to determine whether there is a conflict *unless* the bank actually knows that the number and the name identify different accounts. *See* U.C.C. § 4A-207(b); *Donmar Enters., Inc. v. Southern Nat'l Bank*, 828 F. Supp. 1230, 1239-40 (W.D.N.C. 1993), *aff'd*, 64 F.3d 944 (4th Cir. 1995).

9.    Thus, if a bank does not know about a conflict between the name and number, then it has no duty to determine whether there is a conflict and it may rely on the number as the proper identification of the beneficiary of the order. However, if a beneficiary's bank knows about the conflict between the name and number and

nevertheless paid processed the payment, then the bank could be in violation of Va. Code Ann. § 8.4A-207 (b)(2).

### Count III: Bailment

10.  Under Virginia law, a bailment is "the rightful possession of goods by one who is not the owner." *K-B Corp. v. Gallagher*, 218 Va. 381, 384 (1977). Ordinarily, for a bailment to arise there must be a delivery of the chattel by the bailor and its acceptance by the bailee. *Crandall v. Woodard*, 206 Va. 321, 327 (1965). However, while no formality, contract, or actual meeting of the minds is required to establish the relationship, "the element of lawful possession[…], and duty to account for the thing as the property of another that creates the bailment…." *Id.* In order for an alleged bailee to have possession, "there must be the union of two elements, physical control over the thing possessed, and an intent to exercise that control." *See* R. Brown, The Law of Personal Property s 10.1, 213-14., (3rd ed. 1975); *see also, York v. Jones*, 717 F.Supp. 421, 425 (E.D.Va. 1989). Physical control coupled with an intent to exercise control over the goods constitute possession. *Compare Morris v. Hamilton*, 225 Va. 372 (1983) (guest at party who picks up watch from counter in attempt to return it to owner was a gratuitous bailee) with *K–B Corp.*, 237 S.E.2d 183, 185 (Va. 1977) (no bailment found where employer required employee to furnish his own tools but employee kept them in the office in a locked box to which only employee had the key).

11.  Although bailment requires a common law duty of care, a statute may define the duty of care. *See Williamson v. Old Brogue, Inc.*, 232 Va. 350, 355, 350 S.E.2d 621, 624 (1986) (holding "a statute may define the standard of care to be exercised

where there is an underlying common-law duty....") (citing *Butler v. Frieden*, 208 Va. 352, 353, 158 S.E.2d 121, 123 (1967)). In this case, the NACHA Rules and § 8.4A-207 of the UCC establish that 1st Advantage must act in a commercially reasonable manner or that it exercised ordinary care when it has control over ACH transfers.

### Count V: Fraudulent Concealment

12.    Virginia law has not codified "fraudulent concealment" as a claim available to a plaintiff under an enumerated statute. Rather, fraudulent concealment is recognized by Virginia state law as an "affirmative act or representation designed to prevent, and which does prevent, the discovery of the cause of action." *Culpeper National Bank v. Tidewater Improvement Co., Inc.*, 119 Va. 73, at 83-84 (1916). Accordingly, Virginia courts have consistently held that "[f]raudulent concealment must consist of affirmative acts of misrepresentation, mere silence being insufficient." *Culpeper Nat'l Bank, 119 Va. at 83–84, 89 S.E. at 121* (quoting 2 H.G. Wood & Dewitt C. Moore, Limitation of Actions at Law and in Equity 1422 (4th ed. 1916)); *see also, Newman v. Walker*, 270 Va. 291, 296–97, 618 S.E.2d 336, 338–39 (2005), *see also, Mackey v. McDannald*, 298 Va. 645, 842 S.E.2d 379, 387 (2020) (holding that "[m]ere silence by the person liable is not concealment, but there must be some affirmative act or representation designed to prevent, and which does prevent, the discovery of the cause of action.") (citations omitted).

13.    Plaintiff must show that a defendant concealed with the intent to "trick or artifice preventing, or calculated to hinder a discovery of the cause of action by the use of ordinary diligence, and mere silence is insufficient. There must be something

actually said or done which is directly intended to prevent discovery." *Culpeper Nat'l Bank 119 Va. at 83–84.* Similarly, the Fourth Circuit has interpreted fraudulent concealment as an "equitable doctrine that provides for tolling of a limitations period, [… to] prevent[] a defendant from concealing a fraud, or committing a fraud in a manner that it concealed itself until the defendant could plead the statute of limitations to protect it." *Edmonson v. Eagle Nat'l Bank,* 922 F.3d 535 (4th Cir. 2019).

14.     In the Fourth Circuit, fraudulent concealment applies "in situations where the defendant has wrongfully deceived or misled the plaintiff in order to conceal the existence of a cause of action. *Id.* Accordingly, the Fourth Circuit has long held that to toll a limitations period based on fraudulent concealment, "a plaintiff must demonstrate: (1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence." *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.,* 71 F.3d 119, at 122 (4th Cir. 1995) (citing *Weinberger v. Retail Credit Co.,* 498 F.2d 552, 555 (4th Cir. 1974)). *Id.* at 548 (4th Cir. 2019); *See, e.g., SD3 II LLC v. Black & Decker (U.S.) Inc.,* 888 F.3d 98, 107–08 (4th Cir. 2018); *EQT Prod. Co. v. Adair,* 764 F.3d 347, 370 (4th Cir. 2014); *Go Computer, Inc. v. Microsoft Corp.,* 508 F.3d 170, 178 (4th Cir. 2007).

## IV.    DISCUSSION

For the reasons stated below, the Court finds in favor of the Plaintiff for Counts I and III. The Court will analyze each Count in turn.

A.  **Misdescription of Beneficiary Under UCC § 4A-207**

Virginia Commercial Code required 1st Advantage to reject the ACH deposits if it knew that there was a misdescription between the intended beneficiary (Olympic Steel) and the purported owner of the account receiving the ACH (Taylor). Va. Code Ann. § 8.4A-207. An organization has actual knowledge for a particular transaction "from the time it would have been brought to the individual's attention if the organization had exercised due diligence." Va. Comm. Ann. § 8.1A-202(f). An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routines. Va. Comm. Ann. § 8.1A-202(f). While it is true that 1st Advantage had no duty to proactively discover a misdescription of the Account information, the evidence at trial illustrated that 1st Advantage did not maintain reasonable routines for communicating significant information to the person conducting the transaction. If 1st Advantage had exercised due diligence, the misdescription would have been discovered during the first ACH transfer.

Undisputed testimony at trial showed, Taylor opened the Account at 1st Advantage, triggering an "ID verification warning". Findings of Fact ("FOF") ¶ 74. The alert stated that the system was not able to verify the address that was provided by Taylor, bringing awareness to a possible discrepancy between the information provided and the information on file. *Id.* ¶ 76. Even though the alert was sent to the Compliance Department, the retail staff qualified the information based on Taylor's other accounts with 1st Advantage. *Id.* ¶ 79. Despite the discrepancies and alert, 1st Advantage allowed Taylor to open the Account. *Id.* ¶ 80. Taylor opened a personal checking account, not a business or commercial account. *Id.* ¶ 81. Further, when opening the Account, Taylor informed 1st Advantage that the Account would be used for real estate transactions. *Id.* ¶

72. However, Taylor's application stated that her occupation was a "merchant coordinator." *Id.* ¶ 73. Upon the opening of the Account, 1st Advantage had been notified of identification discrepancies.

Additionally, 1st Advantage failed to establish a reasonable routine to monitor alerts that warned of suspicious activity regarding the Account. Actual knowledge of the misdescription can be imputed on 1 st Advantage because the transfers generated real-time warnings that the name of the intended beneficiary (Olympic Steel) did not match the name of the owner of the account receiving the ACH (Taylor). Notably, Olympic Steel has never had an account at 1st Advantage and could not open an account at 1st Advantage. *Id.* ¶ 88. Further, all ACH transactions were coded as "CCD" yet were still allowed into the Account, which was opened as a personal account. *Id.* ¶¶ 3, 67. 1 st Advantage had access to all of this information in real-time yet no mechanisms to review these systems. *Id.* ¶¶ 60, 62. Even though 1st Advantage claimed to receive hundreds of thousands of similar alerts daily, there was no system in place to escalate pertinent alerts of high value transactions to those handling such transactions. *Id.* ¶¶ 47, 48, 121. Instead, 1st Advantage ignored all warnings generated by their systems designed and used for the purpose of detecting fraudulent or suspicious activity.

Additionally, unrebutted expert witness testimony explained that it was unreasonable for 1st Advantage allow the deposits into the personal account, which was a new account that had a very small starting balance, and multiple large-value transactions. *Id.* ¶ 132. Ward explained that the six-figure consumer deposits were very rare. *Id.* ¶ 90. Moreover, the expert witness explained that not viewing Warnings because of the sheer volume of alerts was not commercially reasonable because 1st Advantage could sort out high-value transactions and the Warnings related to those

transactions. *Id.* ¶ 121. 1st Advantage cannot ignore their own systems to prevent fraud in order to claim that they did not have actual knowledge of said fraud.

It is clear from the evidence presented that 1st Advantage did not maintain any routines, let alone reasonable routines, for communicating significant information to the person conducting the transaction. If 1st Advantage implemented reasonable routines for communicating information, the identification discrepancy recognized at the opening of the Account, the numerous alerts generated by the ACH transfers describing the misdescription of the Account, and the fact that Olympic Steel could not open an Account at 1st Advantage would have alerted 1st Advantage to the misdescription and possible fraud upon the posting of the first ACH transfer. Accordingly, the Court finds that Studco met its burden at trial to prove by a preponderance of the evidence a misdescription of beneficiary in violation of Va. Code Ann. § 8.4A-207.

## B.    Bailment

The NACHA Rules and § 8.4A-207 establish that 1st Advantage must act in a commercially reasonable manner or exercise ordinary care when it has control over ACH transfers. 1st Advantage did not act in a commercially reasonable manner or exercise ordinary care in allowing Taylor to withdraw six-figures over the course of a month. 1st Advantage did not act in a commercially reasonable manner in the following respects.

First, 1st Advantage should have flagged the account as a potentially risky account upon its opening. *Id.* ¶ 118. Undisputed testimony at trial illustrated that new accounts have the most risk within the first six months of opening because that is when many accounts are used for fraud. *Id.* ¶ 133.The Account received high-value transactions coded as CCD even though it was a personal account with a low starting balance. *Id.* ¶¶ 3, 67; Stipulated Facts, ("SF"), ¶¶ 8-9. From

the time of the Account's opening, the Account should have been flagged as a potentially risky account. FOF. ¶ 118.

Second, it was not commercially reasonable for 1st Advantage to allow the ACH deposits in Taylor's account based on the Warnings. Studco's expert opined that 1st Advantage should have designed a filter to focus on the largest transactions that generated Warnings. *Id.* ¶ 121. Studco's expert opined that NACHA Rule 3.8.4 required 1st Advantage to reject the ACHs. *Id.* ¶¶ 123-124.

Third, it was not commercially reasonable for 1st Advantage to allow Taylor to withdraw the funds posted to her account because her actions involved textbook money laundering practices. The expert witness explained the context of money laundering landscape in 2018 as there was tremendous publicity around individuals opening an account for the purpose of assisting in laundering money and moving it overseas. *Id.* ¶ 126. The types of withdrawals Taylor used – cashiers checks and wire transfers – were the type that should "create bells and whistles, alarms and red flags" because they are the "two main methods" used in money laundering. *Id.* ¶ 127. Undisputed testimony illustrated that Taylor's conduct followed the textbook pattern of "high turnover" and "pass through" accounts. *Id.* ¶ 115. The expert further explained that 1st Advantage would have been justified in restricting the account after the first ACH deposit on October 4, 2018. *Id.* ¶ 128.

Fourth, 1st Advantage did not act in a commercially reasonable manner when they failed to take an active role in determining the thresholds for the alerts in the rules and failing to have policies to detect certain types of fraud. 1st Advantage did not change the pre-programmed rules in FCRM. *Id.* ¶ 39. Rather, 1st Advantage was using the "out-of-the-box" rules in FRCM. *Id.* ¶ 40. 1st Advantage's ACH policy did not address how 1st Advantage should handle "exceptions" or Warnings. *Id.* ¶ 58. After an alert was generated, 1st Advantage had no documented guidelines to

determine the appropriate next action based on an alert. *Id.* ¶ 44. Rather, when investigating an account, 1st Advantage made decisions on a case-by-case basis. *Id.* ¶ 36. In 2018, 1st Advantage had a written policy related to processing ACH payments. *Id.* ¶ 52 However, that policy did not address how to handle misdirected payments or fraudulent ACHs. *Id.* While 1st Advantage's tellers are trained to "notify the proper individuals" if they "notice something" in the "normal processing" of a transaction, they are not trained to "do a deep dive into an account." *Id.* ¶ 90. 1st Advantage tellers are trained to look at account history or bring in a manager when there is suspicious activity. *Id.* ¶ 93. 1st Advantage should have detected the suspicious activity during in-person teller interactions and through its FCRM software and placed a restriction on Taylor's account. The above illustrates complete inaction from 1st Advantage.

Fifth, 1st Advantage did not act in a commercially reasonable manner when it failed to review the historical account activity in addition to its automated processes after Taylor's attempted October 25, 2018 international wires. In particular, Ward provided inconsistent testimony of whether he looked at the Account history during the investigation into the attempted international wire transfers. *Id.* ¶ 104-105. Instead, he focused on the discrete international wire transfers. *Id.* ¶ 106. By 1st Advantages own standards, it was not commercially reasonable to only focus on the attempted wire transfers and not look at account history, one of the most important factors. *Id.* ¶ 34. 1st Advantage placed a restriction on wire transfers but allowed Taylor to withdraw almost the exact same amount of money through cashier check withdrawals and domestic wire transfers within days of the attempted international wire transfers. *Id.* ¶ 99; SF, ¶ 9. 1st Advantage's failure to reasonably investigate after October 25, 2018 allowed Taylor to continue to withdraw money from the Account.

Finally, 1st Advantage's affirmative defense of contributory negligence holds no merit because even though Studco fell for a spoofed email 1st Advantage had the responsibility to act in a commercially reasonable manner in handling the in-person withdrawal of money from the Account. Contributory negligence bars recovery if Studco was negligent and that the negligence was a proximate cause, a direct, efficient contributing cause of the harm. *AlBritton v. Commonwealth*, 299 Va. 392, 411, 853 S.E.2d 512 (2021). 1st Advantage relies on *Cincinnati Insurance Co. v. Norfolk Truck Center, Inc.*, a case interpreting the term "directly" in an insurance policy, for the proposition that fraud induced by a false e-mail message inducing the defendant company to pay to wrong account was "directly" caused by computer fraud on company. 430 F.Supp.3d 116 (E.D. Va. 2019). However, that case does not absolve 1st Advantage's duty to act in a commercially reasonable manner. Importantly, 1st Advantage's pattern and practice of ignoring their own systems to detect fraud, failure to look at account history when investigating the Account, and failure to implement commercially reasonable routines to prevent fraud was the direct cause of the withdrawal of funds from the Account. Therefore, the Court finds that contributory negligence does not bar recovery in this case and that 1st Advantage's failure to act in a commercially reasonable manner or exercise ordinary care directly led to the withdrawal of fraudulent funds from the Account. Further, the Court finds that 1st Advantage did not act in a commercially reasonable manner or exercise ordinary care when it maintained control over the ACH transfers at issue.

## C.    Fraudulent Concealment

The facts provided at trial have not sufficiently proven that 1st Advantage provided false information that hindered Studco's ability to recover its funds. The President of Studco, Ben Stevens, called the general telephone number of 1st Advantage, eventually speaking to Keith

Ward, on November 21, 2018. SOF ¶ 134. When Ward spoke to Stevens, he provided information that allowed 1st Advantage to identify "the accountholder within 1st Advantage." *Id.* ¶ 135. 1st Advantage froze all of the member's accounts. *Id.* ¶ 136. Ward spoke with Taylor about the ACH transfers on November 23, 2018; she told him that she had applied to work as a secretary with a person doing real estate transactions and was conducting those transactions based on a job. *Id.* ¶ 137. 1st Advantage shared information about the Account and the activity with JPMorgan Chase as well as SunTrust. *Id.* ¶ 138. Thus, the Court finds that 1st Advantage did not make misrepresentations or affirmative acts designed to prevent the discovery of information to help Studco establish causes of actions against Lesa Taylor.

## V.    CONCLUSION

For the foregoing reasons, the Court **FINDS** in favor of Plaintiffs on Count I and Count III. The Court **FINDS** in favor of Defendant on Count V. Accordingly, **JUDGMENT IS ENTERED FOR PLAINTIFF for compensatory damages in the amount of $558,868.71**. The Plaintiff has not provided sufficient evidence for punitive damages. Further, Defendant is directed to pay attorney's fees and costs. Plaintiff shall file a statement of attorney's fees and costs within fifteen days (15 days) of the date of this Memorandum Opinion and Order.

The Clerk is **DIRECTED** to send a copy of this Order to the parties and counsel of record.

**IT IS SO ORDERED**.


Norfolk, Virginia

January /2̲ , 2023

Raymond A. Jackson
**United States District Judge**

34